Nicole Owens
Executive Director
Deborah A. Czuba, Idaho Bar No. 9648
Mary E. Spears, Indiana Bar No. 27353-49
Assistant Federal Defenders
Federal Defender Services of Idaho
702 W. Idaho Street, Suite 900
Boise, ID 83702
Telephone: (208) 331-5530
Facsimile: (208) 331-5559
ECF:  Deborah_A_Czuba@fd.org
          Mary_Spears@fd.org

*Attorneys for Plaintiff-Intervenor Thomas Eugene Creech*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| **THOMAS EUGENE CREECH**, | ) | CASE NO. 1:23-cv-0081-BLW |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| v. | ) | **COMPLAINT-IN-** |
| | ) | **INTERVENTION** |
| **RAUL LABRADOR**, Attorney General, | ) | |
| Idaho Attorney General's Office, in his | ) | |
| official capacity, **JAN M. BENNETTS**, | ) | |
| Ada County Prosecuting Attorney, in her | ) | |
| official capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

### I.     Nature of the Action

1.     Plaintiff-Intervenor Thomas Eugene Creech is a death-row inmate in

Idaho[1] who brings this Complaint-in-Intervention pursuant to 42 U.S.C. § 1983 for

---

[1] Mr. Creech refers to Idaho as "Idaho," "the State of Idaho," and "the State." Likewise, throughout this complaint, Mr. Creech refers to the Defendants, variously, as "the

COMPLAINT-IN-INTERVENTION – Page 1

violations and threatened violations of his constitutional rights in connection with the State's effort to execute him.

2.      Mr. Creech hereby seeks injunctive and declaratory relief prohibiting Defendants from seeking a death warrant or preparing to execute him until they are capable of carrying out an execution.

## II.     Justiciable Case or Controversy

3.      For the reasons set forth below, absent judicial intervention, Mr. Creech has been and will continue to be tortured by the State of Idaho.

4.      There is a real and justiciable case or controversy between the parties.

## III.    Jurisdiction and Venue

5.      This action arises under 42 U.S.C. § 1983 for violations of the Eighth Amendment to the United States Constitution.

6.      The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights violations), 2201(a) (declaratory relief), and 2202 (further relief).

7.      The Court has personal jurisdiction over the Defendants as they are residents of the State of Idaho and are presently located in the State of Idaho, or are appointed officials of the State of Idaho, or otherwise acting on behalf of the State of Idaho.

---

Defendants," "the State," "the prosecution," and other phrases, as appropriate. His use of these expressions does not limit the scope of the claims, which are brought against each and every named defendant.

COMPLAINT-IN-INTERVENTION – Page 2

8.     Venue in this Court is proper under 28 U.S.C. § 1391 because most of the events giving rise to the claims – including Mr. Creech's potential execution and the procurement and maintenance of drugs and facilities to be used in that execution – have occurred, are occurring, or will occur in the District of Idaho.

9.     Venue is further proper because, upon information and belief, the Defendants all reside in the District of Idaho.

## IV.    Parties

10.     Mr. Creech is a person within the jurisdiction of the State of Idaho.

11.     Mr. Creech is an inmate under the supervision of the Idaho Department of Correction ("IDOC").

12.     Mr. Creech is confined at the Idaho Maximum Security Institution ("IMSI").

13.     Mr. Creech is under sentence of death.

14.     As set forth in greater detail below, the Defendants are state officials involved in the pursuit of death warrants for Mr. Creech.

15.     Defendant Raúl Labrador is the Attorney General of the State of Idaho.

16.     Defendant Jan M. Bennetts is the elected Ada County Prosecuting Attorney.

17.     As such, Ms. Bennetts is the head of the Ada County Prosecutor's Office ("ACPO").

18.     Upon information and belief, Mr. Creech and the Defendants are all United States citizens.

COMPLAINT-IN-INTERVENTION – Page 3

19.     The Defendants are all officials of the State of Idaho.

20.     All of the actions that have been and will be taken by the Defendants towards executing Mr. Creech and any other actions at issue in this Complaint were or will be taken under color of state law.

21.     The Defendants are all sued in their official capacities.

**V.     General Factual Allegations**

22.     Mr. Creech incorporates each and every statement and allegation set forth throughout this Complaint as if fully rewritten.

23.     Mr. Creech was convicted of first-degree murder for the killing of David Jensen and sentenced to death for that offense in Ada County District Court.

24.     Mr. Creech's murder conviction and death sentence were upheld on direct appeal in 1983.

25.     After Mr. Creech obtained federal habeas relief, he was resentenced to death.

26.     The new death sentence was upheld on direct appeal in 1998.

27.     Idaho's execution protocol was last amended in March of 2021.

28.     The March 2021 execution protocol provides policies and procedures relevant to lethal-injection executions.

**A. The State's History of Seeking Ineffectual Death Warrants**

29.     The State has a history of seeking death warrants it cannot carry out.

30.     That practice is amply demonstrated in the case of the named plaintiff in this action, Mr. Gerald Pizzuto.

COMPLAINT-IN-INTERVENTION – Page 4

31.     On November 16, 2022, the Attorney General sought and obtained a death warrant for Mr. Pizzuto. The warrant scheduled Mr. Pizzuto's execution for December 15, 2022.

32.     Also on November 16, 2022, IDOC Director Josh Tewalt informed the Office of the Attorney General that the Department of Corrections was "not in possession of the chemicals necessary to carry out an execution by lethal injection."

33.     On November 30, 2022, fifteen days prior to Mr. Pizzuto's execution, Director Tewalt informed the Attorney General's Office that the Department of Corrections had been unable to obtain the necessary chemicals to carry out Mr. Pizzuto's execution. The Director stated that in his professional judgment it was "in the best interest of justice to allow the death warrant to expire and stand down our execution preparation."

34.     The November 2022 execution warrant for Mr. Pizzuto then was allowed to expire.

35.     On February 24, 2023, the State sought another death warrant for Mr. Pizzuto.

36.     The Attorney General admitted publicly at that point that the State still did not possess the necessary chemicals to carry out an execution by lethal injection.

37.     The February 2023 death warrant for Mr. Pizzuto was obviated by a March 9, 2023, stay of execution, but upon information and belief the State would have been obliged to allow it, too, to expire without carrying out an execution of Mr. Pizzuto.

COMPLAINT-IN-INTERVENTION – Page 5

38.     The practice of obtaining ineffectual death warrants was also evident in the case of another Idaho death row inmate, that of Mr. Erick Hall.

39.     In June of 2018, the Idaho Supreme Court denied Mr. Hall's appeal of the denial of state post-conviction relief.

40.     The State then obtained a death warrant for Mr. Hall for August 1, 2018, notwithstanding that he had not even had the opportunity to begin the process of seeking a writ of habeas corpus from this Court.

41.     This Court promptly stayed the execution, noting that the State had not even waited until federal habeas counsel had been appointed for Mr. Hall before seeking to execute him.

42.     The Court also found that the State acted unreasonably in seeking a death warrant for Mr. Hall which it knew it would not be able to carry out.

**B. Multiple Death Warrants for Mr. Creech in the Months Prior to February 28, 2024**

43.     On October 10, 2023, the Supreme Court declined to grant certiorari in Mr. Creech's federal habeas case that followed his 1998 direct-appeal decision. *See Creech v. Richardson*, 144 S. Ct. 291 (2023) (Mem.).

44.     Two days later, on October 12, 2023, the ACPO sought and obtained a death warrant for Mr. Creech.

45.     The warrant scheduled Mr. Creech's execution for November 8, 2023.

46.     When the warrant was issued, Mr. Creech was taken from J-Block at the Idaho Maximum Security Institution and moved to the Execution Unit in F-Block.

The Execution Unit is a separate building that provides for complete isolation of the condemned from other inmates.

47.     Mr. Creech was asked to select witnesses for his execution.

48.     Mr. Creech was asked to select a spiritual advisor for his execution.

49.     Mr. Creech also was asked about the disposition of his property and his remains.

50.     Also on October 12, 2023, Josh Tewalt ("Director Tewalt"), Director of the IDOC, informed the Ada County District Court by declaration that "execution by lethal injection" was "available in this matter."

51.     On October 18, 2023, twenty-one days before his execution, the Idaho Commission of Pardons and Parole notified the Federal Defender Services of Idaho ("FDSI"), the ACPO, and the Attorney General of their intention to hold a commutation hearing for Mr. Creech. Although the date of the hearing was not scheduled at that time, the Commission notified the parties that it would take place after November 8, 2023 – the then-scheduled execution date.

52.     Idaho law states that a stay of execution "shall be granted . . . as part of a commutation proceeding" of the kind granted to Mr. Creech. Idaho Code § 19-2715(1).

53.     FDSI contacted the Attorney General's office asking if it would stipulate to such a stay given the mandatory language of the statute, but counsel there demurred, claiming the decision to pursue the death warrant was ACPO's.

54.     At an emergency motions hearing in Mr. Creech's method-of-execution challenge case on October 18, 2023, the Attorney General's office repeated this statement on the record.

55.     However, when the ACPO was contacted by FDSI regarding a stipulation to staying the November 8th execution, Defendant Bennetts's office responded with a three-character email: "No."

56.     This required emergency litigation in Ada County District Court, which on October 19, 2023, issued an order staying the execution until the conclusion of commutation proceedings.

57.     On November 17, 2023, the *Idaho Statesman* published a copy of a purchase order it had obtained from the State via a public records request. That purchase order indicated that on some redacted date the State had purchased fifteen grams of pentobarbital for purposes of executing Mr. Creech.

58.     A commutation hearing took place on January 19, 2024.

59.     On January 29, 2024, the Commission of Pardons and Parole issued a 3-3 decision, with three of the Commissioners recommending that commutation be granted and that Mr. Creech's death sentence be changed to a sentence of life in prison without the possibility of parole and three Commissioners reaching the opposite decision.

60.     The Commission regarded the 3-3 decision as a denial of the commutation petition.

COMPLAINT-IN-INTERVENTION – Page 8

61.     The next day, January 30, 2024, the ACPO sought and obtained another death warrant for Mr. Creech. The warrant scheduled Mr. Creech's execution for February 28, 2024.

62.     When the warrant was issued, Mr. Creech was once again taken from J-Block at the Idaho Maximum Security Institution and moved back to the Execution Unit in F-Block.

63.     Mr. Creech was again asked to select witnesses for his execution. Mr. Creech also was once more asked about the disposition of his property and his remains. In particular, he was questioned about the procedure surrounding the autopsy of his dead body.

64.     Also on January 30, 2024, Director Tewalt informed the Ada County District Court that "IDOC [was] in possession of lethal injection chemicals and execution by lethal injection . . . [was] available in this matter."

65.     On February 7, 2024, Idaho Maximum Security Institution ("IMSI") warden Tim Richardson had Mr. Creech get into his wheelchair and wheeled Mr. Creech from his cell in the Execution unit in F-Block to the execution chamber itself. He was specifically shown where his wife, LeAnn Creech, would be sitting and watching her husband be killed.

66.     Mr. Creech continued to be housed in the Execution Unit in F-Block until the morning of February 28, 2024.

COMPLAINT-IN-INTERVENTION – Page 9

**C. The February 28, 2024, Botched Execution of Mr. Creech**

67.    At approximately 10:01 a.m. on February 28th, Mr. Creech was carried into the execution chamber on a gurney, placed on the execution table, and restrained with straps. Witnesses from the media, from the State, and from Mr. Creech's legal team and family were present to see what occurred next.

68.    Mr. Creech looked over and saw his wife LeAnn sitting where he had been told she would be. He mouthed two phrases: "I love you. I'm sorry."

69.    Three unidentified men in scrubs, white hoods covering their faces, blue caps over the hoods, and rubber goggles over their eyes (the "execution team") walked in and checked to see if the restraints were too tight.

70.    None of the members of the execution team identified themselves or their qualifications at any point.

71.    After applying EKG leads to Mr. Creech, members of the execution team applied a blood pressure cuff to Mr. Creech's right arm in an attempt to make a vein visible.

72.    Members of the execution team then applied some sort of dressing to Mr. Creech's right arm and palpated his right arm and hand.

73.    After applying alcohol and a numbing agent to the inside of Mr. Creech's right elbow, the execution team attempted to establish intravenous ("IV") access in his right arm.

74.    Each of these steps were announced to the witnesses by the leader of the execution team as they occurred.

COMPLAINT-IN-INTERVENTION – Page 10

75.     The process described in Paragraphs 71 through 73 took approximately four minutes.

76.     After approximately ninety seconds of attempting, the leader of the execution team announced that the IV attempt in Mr. Creech's right arm had been unsuccessful.

77.     The execution team then repeated the process described in Paragraphs 70 through 72, but on Mr. Creech's right hand instead of his elbow.

78.     The process of preparing Mr. Creech's right hand for IV insertion took approximately two minutes.

79.     After approximately two minutes of attempting, the leader of the execution team announced that the IV attempt in Mr. Creech's right hand had been unsuccessful.

80.     Next, after placing a tourniquet on Mr. Creech's right forearm, the execution team attempted once again to insert an IV into Mr. Creech's right hand.

81.     They repeated the process described in Paragraphs 71 through 73 on Mr. Creech's right hand again.

82.     The second attempt to access a vein in Mr. Creech's right hand took approximately ninety seconds.

83.     The second attempt to access a vein in Mr. Creech's right hand was the third IV attempt overall.

84.     At this point Mr. Creech began to shift back and forth in apparent discomfort, arching his feet and ankles.

85.    After approximately ninety seconds of attempting, the leader of the execution team announced that the second IV attempt in Mr. Creech's right hand had been unsuccessful.

86.    The execution team then moved on to Mr. Creech's left arm. First, they placed the blood pressure cuff on his left arm and stated that they were looking for a suitable injection site.

87.    They then repeated the process described in Paragraphs 71 through 73, but on Mr. Creech's left hand.

88.    The process of preparing Mr. Creech's left arm and hand for the fourth IV insertion attempt took approximately three minutes.

89.    After approximately two and a half minutes of attempting, the leader of the execution team announced that the IV attempt in Mr. Creech's left hand had been unsuccessful.

90.    During this attempt to insert an IV into Mr. Creech's left hand, the leader of the execution team leaned over and whispered something inaudible to one of the other team members.

91.    At this point, just after the leader announced that the fourth IV attempt had failed, it was 10:28 a.m.

92.    The execution team then moved on to Mr. Creech's left leg. First, they removed his left shoe and placed the blood pressure cuff on his lower left leg.

93.    They then repeated the process described in Paragraphs 71 through 73, but on Mr. Creech's left ankle.

COMPLAINT-IN-INTERVENTION – Page 12

94.   The process of preparing Mr. Creech's left ankle for the fifth IV insertion attempt took approximately four minutes.

95.   During the process of preparing Mr. Creech's left ankle for attempted IV insertion, he reached his hand out to where his wife was sitting. His wife placed her hand on the glass separating her from her husband.

96.   After approximately two minutes of attempting, the leader of the execution team announced that the IV attempt in Mr. Creech's left ankle had been unsuccessful.

97.   Next, the team moved to Mr. Creech's right leg.

98.   They repeated the process described in Paragraphs 71 through 73, but on Mr. Creech's right ankle.

99.   The process of preparing Mr. Creech's right ankle for the sixth IV insertion attempt took approximately two minutes.

100.   During this process, Mr. Creech tried to crane his head forward to see what was being done.

101.   As they attempted to secure vein access in Mr. Creech's right ankle, the execution team seemed to be frustrated and to be pushing or moving the cannula or catheter around in Mr. Creech's vein more vigorously.

102.   After approximately five minutes of attempting, it became apparent to witnesses that this sixth IV attempt, in Mr. Creech's right ankle, had been unsuccessful.

103. The leader of the execution team did not announce this fact like he had for the previous five attempts. Instead, the team simply disposed of the cannula or catheter they were using to attempt to gain vein access.

104. At this point, just after the sixth IV attempt had failed, it was 10:42 a.m.

105. The execution team, still holding gauze to the wound in Mr. Creech's right ankle, began to talk among themselves in an agitated way.

106. At 10:45 a.m., the execution team moved back to Mr. Creech's left leg.

107. They stopped talking audibly and the leader of the execution team no longer announced each step of the process described above in Paragraphs 71 through 73.

108. By approximately 10:46 a.m., it became apparent that a seventh IV insertion attempt had begun on Mr. Creech's left ankle.

109. A member of the execution team directed Mr. Creech to relax his left leg.

110. It was not apparent to witnesses what the execution team did then, but Mr. Creech responded by saying "ow" or "ouch."

111. After approximately five and a half minutes of attempting, it became apparent to witnesses that this seventh IV attempt, in Mr. Creech's left ankle, had been unsuccessful.

112. Again, the leader of the execution team did not announce this fact. Instead, the team simply disposed of the cannula or catheter they were using to attempt to gain vein access.

COMPLAINT-IN-INTERVENTION – Page 14

113.   By approximately 10:53 a.m., it became apparent that an eighth IV insertion attempt had begun on Mr. Creech's right ankle.

114.   After approximately two minutes of attempting, it became apparent to witnesses that this eighth IV attempt, in Mr. Creech's right ankle, had been unsuccessful.

115.   Again, the leader of the execution team did not announce this fact. Instead the team simply disposed of the cannula or catheter they were using to attempt to gain vein access.

116.   By 10:55 a.m., Mr. Creech was complaining of pain in his legs.

117.   In the fifty-four minutes since he was brought into the execution chamber, witnesses could see that the execution team had made at least eight unsuccessful attempts to place IVs in order to execute Mr. Creech: one in his right elbow, two in his right hand, one in his left hand, two in his left ankle, and two in his right ankle.

118.   At 10:57 a.m., IDOC staff present in the execution chamber, including IMSI Warden Richardson and Director Tewalt, began speaking with each other.

119.   The execution team left the chamber at this time.

120.   At 10:58 a.m., Warden Richardson announced that the execution was being halted.

**D. Director Tewalt's Comments**

121.   Approximately an hour after calling off the execution, IDOC Director Tewalt spoke to the media.

COMPLAINT-IN-INTERVENTION – Page 15

122.    Idaho's March 2021 execution protocol contains an annex governing the "preparation and administration" of execution chemicals.

123.    That annex allows Director Tewalt to choose one of four lethal-injection cocktails.

124.    For Mr. Creech's execution, Director Tewalt chose Method 4.

125.    Method 4 provides for execution using pentobarbital alone.

126.    As the annex lays out Method 4, IDOC is required to prepare three sets of syringes with pentobarbital: Primary Set A, Backup Set B, and Backup Set C.

127.    Under the annex, each set is to have two syringes, and each syringe is to have 2.5 grams of pentobarbital.

128.    Thus, the annex calls for 5 grams of pentobarbital in each set, and 15 grams total.

129.    Prior to Mr. Creech's execution, IDOC obtained 15 grams of pentobarbital.

130.    Approximately an hour after calling off the execution, Director Tewalt spoke to the media.

131.    At the press conference, Director Tewalt informed the media that IDOC had prepared two of the three sets of syringes addressed by Method 4.

132.    Thus, IDOC presumably placed in these two sets 10 grams of pentobarbital.

133.    Director Tewalt acknowledged that the pentobarbital placed in the two sets of syringes is now unusable for a future execution attempt.

COMPLAINT-IN-INTERVENTION – Page 16

134.    On information and belief, the pentobarbital placed in the two sets of syringes has been disposed of.

135.    Director Tewalt asserted at the press conference that the 5 grams of pentobarbital which had not been placed in syringes is still usable.

136.    It is unknown whether any actions were taken with respect to those 5 grams that might raise questions about the reliability of the chemicals.

137.    On information and belief, the State does not, as of the date of filing, have possession of sufficient lethal-injection chemicals to carry out an execution.

138.    Director Tewalt also explained to the media at the press conference that he did not consider the execution to be a failure because the decision to call off the procedure was the correct one under the circumstances.

139.    As Director Tewalt noted, the execution team trains for scenarios in which it is impossible to gain sufficient access to the inmate's veins such that no execution can be properly carried out.

140.    Director Tewalt described how he continued to have the utmost confidence in the capabilities of the execution team.

141.    In Director Tewalt's remarks to the media, he observed that when the execution team leader left the execution chamber during the procedure, it was to obtain smaller catheters.

142.    Speaking to the Idaho House Judiciary Committee the next day, February 29, 2024, Director Tewalt stated that the execution team had had some difficulty gaining access to Mr. Creech's veins but that the bigger problem was the

COMPLAINT-IN-INTERVENTION – Page 17

quality of Mr. Creech's veins themselves. He reported that the execution team was unable to assure "sufficient quality" to sustain the IV lines.

143.    Even when the execution team could establish an IV, Director Tewalt said, Mr. Creech's vein would collapse, making administration of the chemicals at that location impossible.

144.    Director Tewalt further said to legislators that the execution team had performed a thorough physical examination of Mr. Creech the morning of February 28th with the intent of ensuring they would be able to establish IV lines.

145.    In response to legislator questions, Director Tewalt stated that neither the execution team (by pretending not to be able to find a vein) nor Mr. Creech (by dehydrating himself) had in any way sabotaged the execution.

146.    Director Tewalt was asked by Representative Bruce Skaug why the execution team had not tried to inject lethal injection chemicals into Mr. Creech's neck.

147.    Director Tewalt interpreted that as asking why the execution team had not established a central line.

148.    A central line involves IV placement directly into a major blood vessel like the jugular vein or femoral artery.

149.    Director Tewalt said that the execution team is qualified to establish peripheral IV lines in appendages like arms, feet, legs, and hands, not a central line.

150.    A central line is a surgical procedure, Director Tewalt said.

151.   Although there are lots of ways to establish IV access in emergency medicine, Director Tewalt said, an execution is not emergency medicine being performed with the intent to save a life.

152.   Director Tewalt implied that using a central line to administer lethal injection chemicals might constitute cruel and unusual punishment under the Eighth Amendment.

153.   Effective July 1, 2023, the firing squad was made a permissible method of execution in Idaho, alongside lethal injection. Idaho Code § 19-2716(1).

154.   Director Tewalt told legislators that the firing squad is currently unavailable as a method of execution.

155.   No current facility exists which can safely accommodate use of the firing squad, Director Tewalt said, because the State has not yet found a suitable architecture or engineering firm willing to design it.

156.   Additionally, because Idaho's execution protocol was last amended two years before the firing squad was made a permissible option, it does not take into account the existence of the firing squad.

### E. Mr. Creech's Mental and Medical Condition

#### a. Psychological Symptoms Following the Botched Execution

157.   In the aftermath of the October 2023 and January 2024 death warrants and the botched execution of February 28, 2024, Mr. Creech has had intense psychological symptoms.

COMPLAINT-IN-INTERVENTION – Page 19

158.    Among many other symptoms, Mr. Creech is now experiencing hallucinations. He sees shadows and people oozing through his cell door.

159.    He feels the need to sit in front of a common window overlooking F-Block, where the botched execution took place, and stare at it for nearly an hour at a time.

160.    He loses time when he does this and does not realize he is dissociating from reality.

161.    He cannot recall events from just the day before, even when they involve his wife.

162.    He also "remembers" things that are not real.

163.    Mr. Creech experiences intrusive thoughts regarding his experiences, especially those involving the trauma inflicted on his wife, even when he is trying not to think of a future execution.

164.    He also displays trauma-induced hypervigilance.

165.    He isolates himself from others as a result.

166.    Certain noises bring back traumatic memories for him now, both of the botched execution and of prior trauma in his life.

167.    For example, the sound of a guard brushing past his cell door somehow triggers memories of being molested as a child.

168.    He has an aversion to human touch after the botched execution.

169.    He does not like to be surprised. Change irritates him now in a way it did not before the botched execution.

COMPLAINT-IN-INTERVENTION – Page 20

170.   Mr. Creech's sleep has been greatly disturbed. He often does not sleep and when he does he frequently experiences nightmares of being back on the execution table.

171.   On other nights his nightmares involve re-imagining his wife's face in the window as she watched the State try to kill him.

172.   The puncture wounds left on Mr. Creech's body after the botched execution were circled with marker in order for them to be photographed and identified.

173.   These marks greatly distress Mr. Creech.

174.   He spent a week scouring his body to try to remove them.

175.   Mr. Creech no longer knows if he is alive or dead.

176.   He is unconvinced that anything is actually real.

177.   Mr. Creech is terrified of what is to come.

### b. Medical Conditions and Contraindications for Future Lethal Injection Attempts

178.   After the failed execution attempt, Mr. Creech had nine or ten visible puncture wounds in various locations on his body.

179.   The attempts to access his veins were vigorous and caused him pain and discomfort.

180.   He also has a significantly decreased appetite since the botched execution and has been losing weight.

181.   He has been experiencing poor balance and a loss of equilibrium. The night of February 28, 2024, he fell and hit his head.

COMPLAINT-IN-INTERVENTION – Page 21

182. Mr. Creech has a history for the last five years of edema in his legs. This edema, which is a swelling caused by the trapping of excess water, has ranged in severity over time.

183. Edema can complicate IV access.

184. Mr. Creech has a history of vascular disease as well. Specifically, in September 2022 a large vascular aneurysm was found in Mr. Creech's abdomen.

185. An aneurysm is a weak section of an artery wall. Pressure from inside the artery causes the weakened area to bulge out beyond the normal width of the blood vessel.

186. An abdominal aortic aneurysm is an aneurysm in the lower part of the aorta, the large artery that runs through the torso.

187. Mr. Creech's abdominal aortic aneurysm measured 6.1 by 6.3 centimeters, with a craniocaudal length of 8.5 centimeters.

188. Mr. Creech is also elderly.

189. At 73 as of the date of filing, he is older than the last twenty-nine inmates executed in the United States.

190. Age is a factor that also complicates vein access.

191. Mr. Creech's veins are of poor quality.

192. Every failed attempt to gain IV access to a person's vein damages the blood vessel to some extent.

193. This damage can make it more difficult to access the same vein at a later date.

COMPLAINT-IN-INTERVENTION – Page 22

194. Some of this damage may heal itself over time, but given the quality of Mr. Creech's veins it is impossible to say when or if that will occur.

195. The damage to Mr. Creech's veins that was caused by the February 28, 2024, execution attempt thus may be permanent.

196. Mr. Creech did not attempt to dehydrate himself prior to the execution.

197. To the contrary, Mr. Creech drank and ate normally prior to the execution.

198. IDOC Director Tewalt acknowledged as much in his February 29, 2024, statements to the Idaho legislature.

199. Even if Mr. Creech had attempted to dehydrate himself, dehydration would not have caused the difficulty faced by the execution team on February 28th.

200. Before the execution attempt, IDOC medical staff gave Mr. Creech several doses of Ativan (lorazepam).

201. Ativan is a benzodiazepine used, among other things, to treat anxiety.

202. Anxiety constricts blood vessels, but Ativan would combat that constriction.

203. Catheters used to establish IV access come in various sizes, called "gauges."

204. It is unclear what gauge or gauges of catheters were used by the execution team to attempt to establish IV access to Mr. Creech's body on February 28th.

COMPLAINT-IN-INTERVENTION – Page 23

205.   Different-sized catheters would have different chances of success, depending on the quality of each individual blood vessel attempted.

206.   Different individuals also might be successful gaining access with a particular gauge of catheter while another individual might be unsuccessful using that same gauge of catheter.

207.   In the botched execution of February 28, 2024, the execution team experimented with different gauges of catheters to use on Mr. Creech.

208.   All of these attempts were unsuccessful.

209.   IV access is a skill that must be practiced in order for an individual to retain their ability. It is a "use or lose" skill.

210.   Idaho imposes extreme restrictions on what can be known about the members of the execution/IV access team and their qualifications.

211.   The full qualifications of each of the three execution team members in the room on February 28th are therefore unknown.

212.   Precisely how much practice each of the execution team members has or has had in attempting and establishing IV access in their day-to-day life is also unknown.

213.   In Idaho, the execution team is required to establish IV access in front of witnesses. This is not the case in other jurisdictions, such as (for instance) Alabama.

214.   The botched execution of February 28, 2024, has become both national[2] and international news.[3]

215.   Public scrutiny and stress affect an individual's ability to establish IV access.

### F. Future Death Warrants

216.   Upon information and belief, the Attorney General takes the position that he is legally required to continue to seek and re-seek execution warrants for death row inmates who, like Mr. Creech, have no stay of execution in place.

217.   Upon information and belief, the ACPO and Defendant Bennetts share this position.

218.   Also, upon information and belief, the Attorney General and his office communicate with the ACPO about when to seek death warrants in Ada County cases.

---

[2] *See, e.g.*, N'Dea Yancey-Bragg & Emily DeLetter, *Idaho Delays Execution of Thomas Eugene Creech After "Botched" Lethal Injection Attempts*, USA Today (Feb. 29, 2024); Mike Baker, *A Botched Execution in Idaho Renews Scrutiny of Lethal Injection*, N.Y. Times (Feb.28, 2024).

[3] *See, e.g.*, *Arret in Extremis de l'Execution par Injection Letale d'un Condamne aux Etats-Unis*, Le Temps (Feb. 29, 2024), *available at* https://www.letemps.ch/monde/arret-in-extremis-de-l-execution-par-injection-letale-d-un-condamne-aux-etats-unis (Switzerland); *Keine Vene Gefunden – Hinrichtung in Den USA Nach Einer Stunde Abgerochen*, Welt (Feb. 29, 2024), *available at* https://www.welt.de/vermischtes/weltgeschehen/article250328372/Idaho-Keine-Vene-gefunden-Hinrichtung-in-den-USA-abgebrochen.html (Germany); *Etats-Unis: l'Execution d'un Condamne a Mort Suspendue in Extremis*, Le Figaro (Feb. 28, 2024), *available at* https://www.lefigaro.fr/international/etats-unis-arret-in-extremis-de-l-execution-d-un-condamne-a-mort-20240228 (France); Max Matza, *Thomas Creech: Idaho Execution Delayed After Failed Lethal Injection*, BBC News (Feb. 28, 2024), *available at* https://www.bbc.com/news/world-us-canada-68431330 (England).

COMPLAINT-IN-INTERVENTION – Page 25

219.    Speaking to the House Judiciary Committee on February 29, 2024, IDOC Director Tewalt stated that there are "discussions ongoing" regarding when and whether to seek another death warrant for Mr. Creech.

## VI.    Violation of Mr. Creech's rights under the Eighth Amendment to be free from cruel and unusual punishment.

220.    Mr. Creech repeats and realleges Paragraphs 1 through 219 as though fully set forth herein.

221.    The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. Amend. VIII.

222.    The U.S. Supreme Court has previously described punishments to be unconstitutionally cruel "when they involve torture or a lingering death," *In re Kemmler*, 136 U.S. 436, 447 (1890), or when they "involve the unnecessary and wanton infliction of pain," *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). "Among unnecessary and wanton inflictions of pain are those that are totally without penological justification." *Id.* In determining whether this is the case, courts look to whether the officials involved displayed "deliberate indifference" to the plaintiff's physical or mental health. *See Hudson v. McMillian*, 503 U.S. 1, 8 (1992). That state of mind may be inferred from the fact that the risk of harm is obvious. *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

223.    The Eighth Amendment further forbids "forms of punishment that intensified the sentence of death with a (cruel) superadd[ition] of terror, pain, or disgrace." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1124 (2019).

224. The U.S. Supreme Court has also stated that "a series of abortive attempts" at execution raise an Eighth Amendment claim. *Baze v. Rees*, 553 U.S. 35, 50 (2008); *see also Glass v. Louisiana*, 471 U.S. 1080, 1085-86 (1985).

225. The botched execution of February 28, 2024, was torturous, both profoundly psychologically traumatic and physically painful to Mr. Creech.

226. The State also does not currently have sufficient lethal injection chemicals to carry out an execution of anyone, including Mr. Creech.

227. Even if it did have a sufficient amount of those chemicals, there is no reason to believe the State would be any more successful at administering them to Mr. Creech now than in its failed attempt on February 28th.

228. The damage the botched execution inflicted on Mr. Creech's veins is still in place.

229. There is no indication that in a fresh attempt the State would task different or more skilled or qualified individuals to be part of the execution team attempting to access Mr. Creech's veins.

230. If the State did task different individuals with attempting again to execute Mr. Creech via lethal injection, he would have no way of knowing that was the case.

231. And the difficulties inherent in establishing IV access in a situation subject to intense public scrutiny, where the execution team is being watched by both live witnesses and news readers all over the world, are greater now than they were the morning of February 28th.

232.    The vein-access issues that led to Mr. Creech's execution being botched were not a surprise to the State. Rather, they were foreseeable – Mr. Creech even warned the State of them ahead of time. *See, e.g.*, *Creech v. Tewalt*, No. 1:20-cv-00114 (D. Idaho), Dkt. 123-1 at 10-11 (filed Feb. 6, 2024).

233.    The State thus knew or should have known it would not be able to execute Mr. Creech by lethal injection.

234.    But even given that warning, the State still could not complete that execution.

235.    Lethal injection execution thus is not available in the State of Idaho for Mr. Creech.

236.    Additionally, because the State has no facility that can accommodate it and no protocol that provides policies and procedures for implementing it, the firing squad is likewise not an available method to use to execute Mr. Creech.

237.    Idaho therefore currently has no method available which the State can constitutionally implement to execute Mr. Creech.

238.    Yet the State has demonstrated its willingness to continually seek and attempt to carry out death warrants when there is no available method of execution and/or the State is barred from attempting to carry an execution out.

239.    For the State to seek a death warrant for Mr. Creech when it cannot carry out his death sentence is a harm so obvious that it would constitute deliberate indifference to his physical and mental health, in violation of the Eighth Amendment.

COMPLAINT-IN-INTERVENTION – Page 28

VII.    **Prayer for Relief**

240.    In light of the above, Mr. Creech respectfully requests that the Court:

a)  Enjoin the Defendants from seeking any death warrants until they can establish to the Court that they have secured and are capable of carrying out a valid method of execution that comports with constitutional requirements.

b)  Enjoin the Defendants from undertaking any execution preparations until they can establish to the Court that they have secured and are capable of carrying out a valid method of execution that comports with constitutional requirements.

c)  Grant any such other relief that is just and proper.

DATED this 14th day of March 2024.

/s/ Mary E. Spears
Mary E. Spears
Deborah A. Czuba
Federal Defender Services of Idaho

COMPLAINT-IN-INTERVENTION – Page 29